# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **TELEDYNE TECHNOLOGIES, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 15-cv-1392** |
| | ) | |
| **v.** | ) | **Judge Ronald A. Guzmán** |
| | ) | |
| **RAJ SHEKAR,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Teledyne Technologies, Inc. ("Teledyne") brought suit against its former employee Raj Shekar ("Shekar"), seeking injunctive relief relating to the return of Teledyne property and confidential information following Shekar's termination. (Compl., Dkt. # 1.) The Court issued a temporary restraining order ("TRO") on February 17, 2015. (TRO, Dkt. # 16.) After the Court extended the TRO once, it replaced the TRO with a preliminary injunction ("PI") on March 10, 2015. (PI, Dkt. # 62.) Accordingly, Shekar has been enjoined by either the TRO or the PI from February 17, 2015 to the present. After the PI issued, Teledyne moved for a rule to show cause based on Shekar's failure to comply. (Mot. Rule to Show Cause, Dkt. # 71.) The Court granted the motion on March 23, 2015, and held a show cause hearing over two days on April 30, 2015 and May 6, 2015. At the conclusion of the hearing, the Court directed the parties to file post-hearing briefs. (Dkt. # 91.) Such briefs have now been filed,[1] and the question of

---

[1] Confusingly, Shekar has filed four versions of his post-show cause hearing brief, which appear to differ from each other in only very minor ways and all of which bear different (inaccurate) captions on the docket. (Dkt. ## 104, 105, 106, 107.) As the last three of these were filed on the same day, the Court is uncertain which of these is meant to be Shekar's final version. Regardless, any differences between the briefs do not affect the analysis below.

whether Shekar is to be held in contempt is now before the Court. Also before the Court is Shekar's motion to vacate the PI filed April 27, 2015, which is addressed below as well because Shekar's excuses for noncompliance with the PI in his post-hearing brief are essentially the same as his arguments regarding why the PI should be vacated. (Mot. Vacate PI, Dkt. # 82.)

**Background**

SHEKAR'S TERMINATION

Teledyne, a technology conglomerate, hired Shekar to the position of Marketing/Sales Management in June 2013. (Compl., Dkt. # 1, ¶ 14.) As a condition of employment, Shekar signed a document titled "Employee Patents, Conflict of Interest, and Proprietary Information Agreement" through which he agreed not to disclose Teledyne's non-public information during or after his employment. (Pl.'s Ex. B, Dkt. # 1-1.) Shekar also signed acknowledgments agreeing to abide by Teledyne's email policies and IT systems policies. (Pl.'s Ex. D, Dkt. # 1-1; Pl.'s Ex. E, Dkt. # 1-1.) Through his job in Teledyne's marketing department, Shekar had access to both Teledyne's nonpublic bidding information and customers' nonpublic technical specifications, which were protected by nondisclosure agreements. (Compl., Dkt. # 1, ¶¶ 27-30.) Teledyne terminated Shekar's employment on February 3, 2015 and disabled his access to Teledyne's network the same day. (*Id.*, ¶¶ 41-42.)

TEMPORARY RESTRAINING ORDER

Ten days after Shekar's termination, Teledyne filed its complaint in the instant suit and simultaneously brought an emergency motion for a TRO. (Dkt. # 7.) In these filings, Teledyne alleged that following his termination Shekar failed to return Teledyne's property still in his

possession, engaged in unauthorized communications with Teledyne customers without disclosing that he no longer worked for Teledyne, and retained confidential files and information in electronic form. A hearing was held on the motion for a TRO on February 17, 2015.[2] The Court granted Teledyne's motion and issued a TRO, which prohibited Shekar or anyone acting in concert with him from:

> (a)…using, or disclosing any of Teledyne's confidential, proprietary, and/or trade secret information;
> (b)…accessing or attempting to access Teledyne's information technology systems, including without limitation its server and network;
> (c)…acquiring or attempting to acquire Teledyne's confidential, proprietary, and/or trade secret information;
> (d)…representing himself as employed by or otherwise affiliated with Teledyne; [and]
> (e)…communicating false information about Teledyne's quotes or its bidding and quote process to any customer or potential customer of Teledyne.

(TRO, Dkt. # 16 at 3.) The TRO also ordered that Shekar:

> (f)…within five (5) days of entry of this Order, must return to Teledyne, without retaining any copies, all information, data, files, and other Teledyne property in his possession, custody, or control relating in any way to Teledyne or its business, including without limitation Teledyne's quote files, laptop computer, VPN token, projector, and printer/scanner…within two (2) days of entry of this Order, must contact Aviva Grumet-Morris at (312) 558-8825 or Benjamin Ostrander at (312) 558-3263, both attorneys at Winston & Strawn LLP, and follow their reasonable instructions for the return of this property;
> (g)…within five (5) days of entry of this Order, must provide to Teledyne verified interrogatory responses identifying with particularity all remote storage systems, computers, hard drives, servers, disk drives, flash drives, cellular telephones, cds, dvds, usb drives, and any other devices that can be used to electronically store data or information that are (i) currently accessible by [Shekar] or in [Shekar's] possession, custody or control, or (ii) have been accessible by [Shekar], or in [Shekar's] possession, custody or control, at any time since July 1, 2013. With respect to any devices identified in (b)(ii), the interrogatory responses must explain, if applicable and in detail, why each such device is no longer accessible by [Shekar], or in [Shekar's] possession, custody or control, and what information was contained on each such device. The interrogatory responses must also specify all passcodes, passwords, or decryption keys necessary to access and examine such devices and systems. The interrogatory responses must further specify whether [Shekar] has, at any time, given or transmitted or offered to give or

---

[2] At this hearing, the Court noted that despite Teledyne's assertion that their multiple attempts to serve Shekar were unsuccessful, Shekar appeared to have knowledge of the proceedings based on the fact that he had engaged in unauthorized ex-parte email communications with the Court and its staff. (Dkt. # 14.)

transmit any of Teledyne's information or documents to any third-party, and, if so, must identify with specificity: (x) the information or documents so given or transmitted; (y) the name, address and telephone number of the third party or parties to whom the information or documents were given or transmitted; and (z) the date, time and method by which the information or documents were given or transmitted;

(h)…shall preserve all documents (including electronically stored information), devices, equipment, and materials in whatever form that are or could be relevant to the allegations of the Verified Complaint, and [Shekar] shall not alter, delete or destroy any such documents, devices, equipment and materials in any form;

(i)…within five (5) days of service of this Order, shall provide to Teledyne a declaration certifying his compliance with paragraphs (f) and (h) above.

(*Id.* at 3-4.) The TRO was originally set to expire on February 27, 2015, but was extended on that date until March 13, 2015. (Dkt. # 38.)

PRELIMINARY INJUNCTION

On March 3, 2015, Teledyne moved for a PI, and after Shekar failed to appear at a March 10, 2015 hearing, the Court granted the motion and entered a PI. (Dkt. # 61.) The requirements imposed on Shekar by the PI were essentially identical to those of the TRO quoted above, with the additional requirement that Shekar:

within five (5) days of entry of this Order, must produce to Teledyne for imaging and inspection, without retaining any copies, all computers and other devices in his possession, custody, or control, and must provide Teledyne with unrestricted access to all external or remote storage systems, devices, or email accounts of any kind that are owned, controlled by, or accessible to [Shekar] to permit reasonably tailored searches likely to produce relevant information or likely to lead to the discovery of relevant information. Teledyne shall take reasonable steps to screen for personal information and information not related to the allegations in the Verified Complaint. Teledyne shall promptly return to [Shekar] all systems and devices produced upon completion of imaging. [Shekar], within two (2) days of entry of this Order, must contact Aviva Grumet-Morris at (312) 558-8825 or Benjamin Ostrander at (312) 558-3263, both attorneys at Winston & Strawn LLP, and follow their reasonable directions for the production of these items

(PI, Dkt. # 62, at 7-8.)

<u>SHOW CAUSE HEARING</u>

One week after the PI issued, Teledyne filed a motion for a rule to show cause, alleging that Shekar had failed to comply fully with most of the requirements of the TRO and the PI. (Dkt. # 71.) The Court granted the motion and set a show cause hearing, which was held over two days on April 30, 2015 and May 6, 2015. The only witnesses who testified at the hearing were Shekar and Daniel Roffman, a forensic computer analyst retained by Teledyne. Roffman testified that he had received and analyzed a total of four items from Shekar in connection with this litigation: a printer, an iPhone, a VPN token, and one external hard drive. (Apr. 30 Tr., 53:16-23.)

Roffman also analyzed the hard drive of Shekar's Teledyne laptop. Roffman did not have access to the actual laptop, however, because the laptop is in the custody of the FBI. Shekar testified at the hearing that after he was terminated by Teledyne, he contacted the Inspector General for the Department of Defense Criminal Investigation Services ("DCIS") to report some unspecified criminal conduct by Teledyne. (*Id*. at 28:2-12.) On February 20, 2015, two weeks after Shekar's termination and three days after the Court issued its TRO, Shekar drove the laptop to Des Plaines, Illinois and turned the laptop over to DCIS. (*Id*. at 29:16-21.) At some point the laptop apparently fell into the hands of FBI agents, because Roffman testified that his office received a forensic image[3] of the laptop's hard drive from FBI agents. (*Id*. at 54:5-22.)

Roffman testified that he conducted various tests to ensure that the image of the Teledyne laptop was an exact duplicate. These included running a hash algorithm against the image to make sure it was an unmodified copy of the laptop held by the FBI, as well as confirming that the laptop in question was actually Shekar's work laptop by (1) noting that all the sent emails

---

[3] A forensic image is an exact duplicate of the contents of a hard drive preserved in electronic form. (Apr. 30 Tr., 54:12-20.)

saved on the hard drive originated from Shekar's Teledyne email address (*Id*. at 54:23-55:14); (2) discovering folders on the hard drive labeled "Raj" and "R. Shekar" (*Id*. at 55:11-13); and (3) confirming that the laptop had connected to Teledyne's network in the past (*Id*. at 55:13-14). Having verified the authenticity of the image, Roffman then investigated whether any external devices had been connected to the laptop and testified that eleven different devices (all either USB "flash" drives or external hard drives) had connected to the laptop. (*Id*. at 55:15-56:18.)

Three of these external hard drives are particularly relevant here, because they connected to the laptop on or after Shekar's termination date of February 3, 2015. (*Id*. at 56:19-57:1.) Roffman's forensic analysis determined that two of these hard drives were Western Digital-brand, while the third was manufactured by Seagate and had a serial number of NA7J5C1K. (*Id*. at 57:2-13.) By analyzing the Windows backup tool on the laptop's hard drive, Roffman determined that on November 29, 2014, files were backed up from the laptop to the Seagate hard drive. (*Id*. at 58:19-60:4.) Artifacts retained on the laptop's operating system also confirmed that files were stored on the Seagate hard drive, and several of these files proved to be Teledyne files (such as pricing sheets) that were also saved on the laptop hard drive. (*Id*. at 60:10-61:14.) Finally, Roffman testified that of the Teledyne files on the Seagate external hard drive, several were accessed by a user on or after Shekar's termination date. (*Id*. at 60:20-61:7.)

## **Legal Standard**

Courts enjoy the "inherent power to enforce compliance with their lawful orders through civil contempt." *Armstrong v. Executive Office of the President, Office of Admin*., 1 F.3d 1274, 1289 (D.C. Cir. 1993) (citing *Shillitani v. United States*, 384 U.S. 364, 370 (1966)). To be held in civil contempt, a litigant must have "violated an order that sets forth in specific detail an

unequivocal command from the court." *United States v. Dowell*, 257 F.3d 694, 699 (7th Cir. 2001). The terms of an injunction may qualify as such an unequivocal command, and a court's civil contempt power may therefore be properly employed to enforce an injunction. *See S.E.C. v. Homa*, 514 F.3d 661, 674 (7th Cir. 2008) (noting that "the court whose order was defied must enforce the injunction through the contempt power because contempt is, in essence, an affront to the court that issues the order"). Proof of such a violation need only be by clear and convincing evidence, not the higher standard of proof required to hold a party in criminal contempt. *See Goluba v. Sch. Dist. of Ripon*, 45 F.3d 1035, 1037 (7th Cir. 1995) ("To win a motion for civil contempt, a party must prove by clear and convincing evidence that the opposing party violated a court order") (internal quotation omitted); *Stotler & Co. v. Able*, 870 F.2d 1158, 1163 (7th Cir. 1989). Clear and convincing evidence is evidence that creates "an abiding conviction that the truth of [the movant's] factual contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).

Teledyne accordingly bears the burden of establishing a prima facie showing of contempt. To do so, it must show by clear and convincing evidence that (i) the TRO and/or the PI set forth unambiguous commands; (ii) Shekar violated those commands; (iii) his violation was significant, meaning that he did not substantially comply with the orders; and (iv) he failed to take steps to reasonably and diligently comply with the order. *See F.T.C. v. Trudeau*, 579 F.3d 754, 763 (7th Cir. 2009). A finding of willfulness is not required to hold a party in civil contempt; all that must be shown is that a party "has not been reasonably diligent and energetic in attempting to accomplish what was ordered." *Goluba*, 45 F.3d at 1037; *see also S.E.C. v. McNamee*, 481 F.3d 451, 456 (7th Cir. 2007) ("[S]cienter is not required in civil-contempt proceedings").

**<u>Discussion</u>**

<u>NOTICE ISSUES</u>

At the outset, it is necessary to briefly address Shekar's argument that he did not have proper notice of Teledyne's motions for the TRO and the PI. Given that Shekar testified as to the alleged notice deficiencies at the show cause hearing and devotes significant space to this issue in his post-hearing brief, he appears to believe that these deficiencies would render the TRO and PI invalid and thereby excuse his compliance with them. *See United States v. Microsoft Corp.*, 147 F.3d 935, 944 (D.C. Cir. 1998) ("Preliminary injunctions entered without notice to the opposing party are generally dissolved"). If an underlying order is invalid, a contempt judgment based on it will not ordinarily stand. *See Marrese v. Am. Acad. Orthopaedic Surgeons*, 726 F.2d 1150, 1157 (7th Cir. 1984) ("If the underlying order is invalidated, the contempt judgment falls with it"), *rev'd on other grounds*, 470 U.S. 373 (1985). Shekar also relies on alleged notice inadequacies in his motion to vacate the PI. These arguments are unavailing for several reasons.

To begin with, Shekar did in fact have actual notice of the relevant motions, despite his consistent attempts at evading service. Teledyne attempted to serve its motion for a TRO by hand delivery to Shekar's address in Hanover Township as well as by email to 13 addresses Shekar has been known to use. (Dkt. # 20.) While Shekar denies having received such notice, the Court has already found that he was aware of the motion and hearing because the Court received from him unauthorized, ex-parte email communications challenging the Court's jurisdiction on the very morning of the hearing. (Dkt. # 14.) Shekar then filed a motion to vacate the TRO on February 23, 2015, in which he demanded that all future attempts to serve him with notice be directed only to a P.O. Box in Schaumburg, Illinois. (See Dkt. # 36, at 12.) Teledyne obliged by

sending notice of its motion for a PI to the specified P.O. Box, in addition to serving Shekar through mail at his house and by email to 15 different addresses. (Dkt. # 56.) Shekar insisted at the show cause hearing that he had never received notice of the PI motion through any of these three channels. (Apr. 30 Tr., at 30:13-32:5.)

He explains his peculiar elusiveness by asserting that: (1) all of the email addresses Teledyne attributes to him are "obsolete"; (2) even if such addresses were not obsolete, notice sent to them by Teledyne's attorneys would have bounced back because Shekar's ISP automatically blocks any emails from addresses ending in "@winston.com" (the domain allegedly used by Winston & Strawn, Teledyne's counsel); (3) he was traveling away from home on business during the period when service to his home by mail would have been attempted; and (4) mailings to the P.O. Box would have been returned because the box "is not in Shekar's name." (*Id*. at 32:6-15; Def.'s Rule to Show Cause Brief, Dkt. # 107 at 2 n.1, 3.) The argument that all the email addresses were "obsolete" or not controlled by Shekar is belied by the fact that Shekar sent unauthorized ex-parte communications to the Court from some of these same addresses on or after the date of the TRO hearing. Shekar has also presented no evidence beyond his own assertions that he instructed his internet service provider to automatically reject emails from Winston & Strawn attorneys – and even if such evidence were furnished, Shekar can hardly expect to be rewarded for willfully evading notice. The record also contradicts Shekar's testimony that he was away from home throughout the relevant period, as only two days before Teledyne filed its motion for a PI, a process server finally succeeded in cornering Shekar in the open garage of his Hanover Township home and personally serving him with summons.[4]

---

[4] Shekar responded by immediately filing a motion to quash the service of summons, in which he alleged that the so-called process server was in fact a trespassing intruder who came "charging to attack Shekar" with evil intent and no service papers. (Dkt. # 63 at 1-2.) The Court considers these allegations wholly incredible and affords them no weight.

(Summons, Dkt. # 50.) Finally, the P.O. Box Teledyne's counsel used to notify Shekar of the motion for a PI is the very one Shekar himself demanded all notice be sent to. Therefore, the Court finds that Shekar had valid notice of the motion for the PI and denies Shekar's motion to vacate the PI.

Moreover, even if Shekar were correct that he had no notice of the underlying motions, this fact would be irrelevant to the question of contempt because he unquestionably had actual notice of the TRO and PI themselves. A finding of contempt requires only a showing that the alleged violator of a court order had actual notice of the order. *See Graves v. Kemsco Grp., Inc.*, 676 F. Supp. 1411, 1416 (N.D. Ind. 1987), *aff'd*, 852 F.2d 1292 (Fed. Cir. 1988). A party cannot escape a contempt finding for violating an explicit court order simply by claiming that the order was invalid due to notice or service problems. *See S.E.C. v. Kimmes*, 753 F. Supp. 695, 700 (N.D. Ill. 1990) (holding in contempt defendant who "arrogantly and surreptitiously flouted a court order of which he was fully cognizant" and noting that "[n]o one has the right to do that even if such a court order is downright void."). Shekar has admitted in court filings that he received a copy of the TRO by February 21, 2015 at the latest.[5] (*See* Dkt. # 36, ¶ 3.) He also concedes that he was aware of the PI "after the preliminary injunction order was entered on March 10, 2015." (Def.'s Rule to Show Cause Brief, Dkt. # 107, at 5.)

In summation, the record is clear that Shekar had actual notice of both the pleadings underlying the TRO and PI and the orders themselves, and was therefore obligated to comply with the TRO at least from February 21, 2015 and to comply with the PI beginning March 10, 2015.

---

[5] Shekar complains that the copy of the TRO was not properly served on him, and that he only received it because "a passing stranger" in his neighborhood found a manila envelope covered in ice on the street and passed it along to him. (Dkt. # 36, ¶ 3.) Even if these implausible allegations are accurate, all that matters is that he had notice of the TRO's commands.

CHALLENGES TO ROFFMAN'S TESTIMONY

It is also necessary to briefly address Shekar's objections to Roffman's qualifications and methodology. Shekar's post-hearing brief demands that Roffman's testimony be "excluded and suppressed" on the grounds that he is "Teledyne's incredibly well paid 'hired gun.'" (Def.'s Rule to Show Cause Brief, Dkt. # 107, at 14.) Shekar also challenges Roffman's qualifications to testify as to how Teledyne's servers work on the grounds that "Shekar has more expertise to testify as to how Teledyne server works having worked for Teledyne for close to two years." (*Id.* at 17.) Throughout his brief, Shekar challenges all of Roffman's testimony as inconsistent, impossible, or outright lies.

None of these objections are well-founded. Roffman adequately established his credentials by testifying to his experience and training in computer forensics, including working two years at the Department of Justice and supervising a computer forensic lab in Chicago for nine and a half years. (Apr. 30 Tr., 49:22-51:13.) He has testified before this and other courts as an expert witness in the past, including by appointment of the court at both the federal and state levels. (*Id.* at 52:10-53:5.) Finally, Roffman testified that Teledyne's payments to his forensics firm did not influence the conclusions of his investigation. (*Id.* at 88:12-17.) Shekar has advanced no evidence to call into question Roffman's qualifications as an expert, and the mere fact that Roffman was hired by Teledyne to conduct the analysis in question does not render his testimony irredeemably tainted. The Court has carefully examined all of the testimony Shekar identifies as inconsistent or duplicitous, and concludes that Roffman's testimony was internally consistent and credible throughout.

In addition to challenging Roffman's qualifications, Shekar asserts that Roffman's methods of analyzing the laptop were inherently unreliable and that his testimony should be excluded on that basis. In essence, Shekar argues that even if Roffman is telling the truth about his analysis of the hard drive image, the authenticity of the image is "under serious suspicion." (Def.'s Rule to Show Cause Brief, Dkt. # 107, at 15.) Shekar points to the fact that Roffman never saw the actual Teledyne laptop, couldn't know what the government had done with the laptop prior to imaging it, and did not know when the FBI handed the image over to Teledyne.[6] (*Id*. at 14.) These contentions are not sufficient to cast doubt on the clear evidence that the image was of Shekar's own company laptop and that it was an authentic and unaltered copy of the laptop hard drive. That Roffman analyzed an image file rather than the actual laptop hard drive is not material, as Roffman testified that his forensic lab typically works from image files even when they have possession of the actual device in question in order to avoid accidentally altering the original device. (Apr. 30 Tr., 88:22-89:3.) As noted above, Roffman also conducted several tests to verify that the image actually came from Shekar's work laptop and that the image file received from the FBI was an unaltered duplicate. Roffman also foreclosed Shekar's speculations regarding tampering, by determining that the last date any file on the hard drive was modified was February 17, 2015 – three days before Shekar claims to have turned the laptop over to the government.[7] (*Id*. at 89:11-16.)

---

[6] Shekar makes several other unsupported factual assertions in his brief, such as that: (1) DCIS told Shekar after the hearing that they had no record of an image being made; (2) there is "an internal criminal investigation" targeting the unknown FBI agent who gave the image to Teledyne; and (3) the image was "illegally made through [a] 'back door' with no record." (Def.'s Rule to Show Cause Brief, Dkt. # 107, at 16-19.) If Shekar wished the Court to consider these facts, it was his responsibility to produce proof of them at the show cause hearing.

[7] And, perhaps not coincidentally, the date the Court issued the TRO ordering Shekar not to alter any Teledyne information in his possession. While this timing is suspicious, there is insufficient evidence to hold Shekar in contempt based on alteration of the laptop files because Roffman's testimony did not specify which specific files were altered on February 17 or at what time of the day.

Shekar introduced no evidence to rebut or call into question Roffman's conclusions regarding the image's authenticity or the reliability of the analysis based on it.[8] As such, the evidence clearly reflects that the image file was an accurate representation of the Teledyne laptop on the date it left Shekar's possession.

INSTANCES OF CONTEMPT

Teledyne identifies seven specific violations for which it argues Shekar should be held in contempt, namely that he: (1) failed to produce his personal computer devices for imaging; (2) failed to produce for inspection 11 external hard drive devices that were connected to his Teledyne laptop during his employment; (3) returned his Teledyne iPhone with passcode protection such that Teledyne cannot access it; (4) failed to turn over all Teledyne information in his possession; (5) failed to provide complete and truthful answers to interrogatories; (6) altered evidence by modifying the iPhone password; and (7) failed to submit a complete and truthful declaration of compliance. (Pl.'s Rule to Show Cause Brief, Dkt. # 96.) The Court addresses each of these allegations in turn.

*1: Shekar's failure to produce his computer*

---

[8] In his post-hearing brief, Shekar also posits a conspiracy theory that is speculative and highly implausible. He suggests that a rogue FBI "mole" conspired with Teledyne to create an elaborate exact duplicate of Shekar's laptop, then plugged various hard drives into this duplicate and altered its data in order to frame Shekar for violating the Court's orders. (*See* Def.'s Rule to Show Cause Brief, Dkt. # 107, at 15-19.) The rogue FBI agent took such drastic steps because the managing partner of Teledyne's counsel was a U.S. Attorney at some point in the past. (*Id*. at 16.) What motive Teledyne itself would have for such a complicated ruse is unclear; given that Shekar violated the TRO and PI in the myriad other ways reviewed in this opinion, this seems a lot of trouble to go through to manufacture yet another instance of contempt. In any case, Shekar offers no evidence whatsoever of such a conspiracy and the Court need not spill further ink discussing it. *See Wells v. Unisource Worldwide, Inc*., 289 F.3d 1001, 1007 (7th Cir. 2002) (noting that courts have "typically been wary of allegations based on nothing but an attempt to come up with a conspiracy theory and in particular where there is not a scintilla of evidence in the record before us to support [plaintiff's] theory").

The PI included a provision requiring Shekar to produce to Teledyne for imaging and inspection "all computers and other devices in his possession" within five days of the PI's issuance. (PI, Dkt. # 62, at 7-8.) Shekar admits that he owns a home computer used by himself and his family. (Apr. 30 Tr., 32:19-22.) He further admits that to this day, he has not turned the computer over for inspection. (*Id.* at 41:24-42:2.) While the order was not limited to devices on which Shekar did Teledyne work, he has conceded that he used this home computer for Teledyne business on at least some occasions. (*Id.* at 33:10-34:4.)

Shekar first argues that he was not required to produce this computer because the Court's order regarding his "Personal Computer" was unclear. (Def.'s Rule to Show Cause Brief, Dkt. # 107, at 7.) He states that the home computer is not his *personal* computer, because it is also used by his family members and contains data belonging to them. This argument fails because Shekar confuses statements made by Teledyne's attorneys with the orders of the Court. While Teledyne's counsel referred to the computer in question as Shekar's personal computer at the hearing and in briefs, the PI did not contain the qualifier "personal" and instead unambiguously required Shekar to produce *all* computers and other devices in his possession, custody, or control. There is no dispute that Shekar's home computer was in his possession, whether other family members used it or not. That he honestly believed the order did not apply to his home computer is also belied by the fact that he filed a motion to vacate the PI in which he made various arguments as to why he should not have to turn over what he ironically refers to as his "personal computer." (Mot. Vacate PI, Dkt. # 82 at ¶ 30.)

Shekar's other justification for failing to produce the computer is even less persuasive: he argues that the computer contains his and his family's personal data, and that any attempt by Teledyne to access it would therefore be "illegal and an invasion of Shekar's wife, daughter and

son's rights to privacy."[9] (*Id.*) If litigants were free to ignore any terms of an order that they felt were unreasonable or violated their privacy, the injunctive powers of the courts would be hollow indeed. Shekar's concerns regarding his personal data may well be legitimate, but such concerns were adequately addressed by the PI's requirement that Teledyne access the computer only to "permit reasonably tailored searches" and "take reasonable steps to screen for personal information and information not related to the allegations in the Verified Complaint." (PI, Dkt. # 62, at 7-8.) If Shekar required further protection, the appropriate response was not to simply flout the Court's commands but to timely move for a modification of the TRO or a protective order. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949) (finding that contempt liability was appropriate for respondents who violated terms of decree, because "if there were extenuating circumstances or if the decree was too burdensome in operation… Respondents could have petitioned the District Court for a modification, clarification or construction of the order").

In summation, the record reflects by clear and convincing evidence that Shekar violated the PI by refusing to produce his home computer for inspection.

*2: Shekar's failure to produce external hard drives*

As noted above, the PI required Shekar to turn over for imaging and inspection not only any computer in his possession, but also "other devices" including "all external or remote storage systems, devices, or email accounts of any kind" in his possession. (PI, Dkt. # 62, at 7-8.) Teledyne alleges that Shekar has failed to turn over the eleven specific external storage devices identified by Roffman as having been connected to Shekar's Teledyne laptop, and focuses more

---

[9] Shekar also makes a single conclusory statement that the order to produce his computer violates his Fourth Amendment right against unreasonable search and seizure. (Def.'s Rule to Show Cause Brief, Dkt. # 107, at 8.) This argument is not sufficiently developed for the Court to address it.

specifically on the three drives connected on or after Shekar's termination date. Shekar turned over one external hard drive to Teledyne, but insists that he possesses no other devices aside from his home computer. (Apr. 30 Tr., 41:10-42:16.)

Roffman testified that two Western Digital hard drives were hooked up to the Teledyne laptop sometime between February 3 (when Shekar was terminated) and February 17 (when the laptop hard drive was last modified). Shekar testified at the hearing that he never used a Western Digital hard drive on the laptop. (May 6 Tr., 17:21-18:16.) In light of his disingenuous, obstructive conduct throughout this case, the consistent implausibility of his assertions,[10] and the disconnect between his own interested testimony and the relatively disinterested analysis of the expert witness, the Court does not consider Shekar's testimony on this point credible. As noted above, the Court finds Roffman's analysis of the laptop image to be reliable and credible, and therefore concludes that Shekar used two Western Digital hard drives with the Teledyne laptop. Because he has failed to turn these devices over or otherwise account for their whereabouts, Shekar is in contempt of the unambiguous commands in the PI.

The Seagate-brand hard drive is an only slightly closer question. While Shekar turned over a Seagate-brand external hard drive device on April 21, 2015, Roffman's analysis revealed that this drive was not the same device that had been plugged into Shekar's Teledyne laptop on or after his termination date. Several elements of the forensic analysis support this conclusion.

---

[10] Aside from the conspiracy theories mentioned above, Shekar has made numerous other representations that the Court views with skepticism. Most relevant here, he has asserted in court filings that he possesses no drives or electronic storage devices yet emphasizes in his briefs that he is "an electrical and electronics engineer by education and employment" who runs his own computer consulting business. (Def.'s Rule to Show Cause Brief, Dkt. # 107, at 2-3.) It seems distinctly unlikely that as an engineer and a professional computer guru, Shekar truly does not use in either his business or personal affairs *any* electronics other than a home computer he shares with his family – particularly in light of the fact that tablets, smart phones, flash drives, and even recordable CDs or DVDs all fall within the broad terms of the PI. (*See* PI, Dkt. # 62, at 7-8) (requiring that Shekar produce all "computers or other devices" including "all external or remote storage systems, devices, or email accounts"). It is also highly improbable that he possesses no email accounts, given that he has communicated with the Court and Teledyne via email. Yet he has failed to allow Teledyne access to the email accounts he controls, another clear violation of the Court's orders.

First, Roffman was able to determine that the serial number of the Seagate hard drive connected to the laptop on or after Shekar's termination date was NA7J5C1K; the drive Shekar turned over to Teledyne had a different serial number, NA7L46R4. (Apr. 30 Tr., 63:23-65:3.) When Roffman checked the records associated with these two serial numbers via Seagate's website, he found that the two numbers had different warranty periods; this suggests that numbers belong to two devices purchased at different times. (*Id*. at 65:4-14.) Even more significantly, the forensic analysis revealed that the NA7J5C1K drive was used to back up the files on the laptop on November 29, 2014, and that drive contained Teledyne files accessed on or after Shekar's termination date. (*Id*. at 58:19-61:19.) The NA7L46R4 drive produced by Shekar, however, had never connected to the laptop and in fact contained no user-generated information whatsoever – it appears to have been a totally blank drive, turned over to Teledyne fresh from the electronics store having never been used. (*Id*. at 61:23-62:20).

Shekar concedes that the drive he turned over to Teledyne was unused, but explains that he purchased the NA7L46R4 drive in November 2014 to store data for a business trip but never used the drive because the trip was cancelled. (May 6 Tr., 18:17-21:5.) He insists that it would "not make any rational sense" for him to buy a hard drive with his Teledyne Visa card if he intended to use it to surreptitiously copy files. (Def.'s Rule to Show Cause Brief, Dkt. # 107, at 8 n.5.) There was nothing necessarily illicit, however, about the November 2014 data backup, as Shekar was at that time a Teledyne employee in good standing and may have simply backed up the data on his work laptop as a precaution. He also alleges that "Teledyne with the help of FBI might have scrambled the serial number to make it look different" or might have purchased and plugged in the NA7J5C1K specifically to frame him, but these allegations are as unsupported by evidence as his other conspiracy theories. (*Id*. at 18-19.) The Court finds that

Roffman's testimony establishes by clear and convincing evidence that Shekar failed to turn over the Seagate drive with serial number NA7J5C1K and finds him in contempt for this violation of the PI.

*3: Shekar's failure to return an iPhone in usable condition*

Both the TRO and the PI required Shekar to return all Teledyne property in his possession within five days of the order, and it is undisputed that at the time the orders were entered Shekar possessed a Teledyne-issued iPhone. While Shekar did turn this phone over to Teledyne for inspection, he did so on March 30, 2015 – twenty days after the PI issued, and more than five weeks after the TRO. (Apr. 30 Tr., 53:16-23.) Teledyne objects that the turnover of the iPhone violated the Court's orders because it was (and still is) protected by a passcode that prevents Teledyne from accessing it.[11] Roffman testified that when his lab received the iPhone from Shekar, it was protected by a passcode. (*Id.* at 65:24-66:6.) Roffman demonstrated at the hearing that the passcode the lab received from Shekar, "2325," does not unlock the phone, and consequently Teledyne has not been able to analyze its contents. (*Id.* at 69:4-73:18.) To prove that the phone shown in court was Shekar's, Roffman testified that the International Mobile Station Equipment Identity ("IMEI") number on the phone in court matched the IMEI number logged on the chain-of-custody form when Shekar turned it over. (*Id.* at 69:22-71:7.) To prove that it had not been tampered with after leaving Shekar's possession, Roffman testified that between Shekar's production of it and the hearing date the phone had remained in his firm's forensics lab – which was protected by, among other security features, biometric access controls.

---

[11] Teledyne also objects that the iPhone was turned over late. The Court declines to enter a finding of contempt on this ground, however, because in a civil contempt proceeding, a court's contempt power is employed not to punish a recalcitrant litigant but to coerce compliance with court orders. *See Shillitani v. U.S.*, 384 U.S. 364, 370 (1966). As the iPhone has now been produced and the order complied with, it is unclear what remedy Teledyne could be entitled to simply from a delay in compliance (given that Teledyne failed to prove any specific harm from the delay that would justify an order of restitution).

(*Id.* at 70:5-72:18.) Shekar insists that before returning the phone, he changed the settings to remove any passcode protection and the "2325" code was indeed the one that unlocked the phone before he removed the passcode protections. (May 6 Tr., 10:24-11:19.) In support of this claim he offers an affidavit from his attorney James Borcia, who testifies that when Shekar turned the phone over to him to produce to Teledyne, he saw Shekar unlock the phone simply by sliding the unlock bar without entering a passcode. (Def. Ex. 9.) Shekar believes that the reason the iPhone could not be accessed in court is that Teledyne "remotely disabled the iPhone through the wireless phone provider, in order to block the emails from their attorneys as those emails in the iPhone are detrimental to their case." (Def.'s Rule to Show Cause Brief, Dkt. # 107, at 10.)

Once again, Roffman's testimony is more credible than Shekar's unsupported conspiracy theories.[12] There is no evidence from which the Court could conclude that Teledyne had the technical capability to remotely alter the iPhone's passcode protection, and certainly no evidence that such alteration actually occurred. In light of Roffman's credible testimony that the phone was kept in a secured lab and not tampered with, the evidence clearly reflects that Shekar protected the iPhone with a passcode other than 2325 before turning it over to Teledyne.[13] Shekar argues, however, that even if he had turned the iPhone over in an inaccessible state, this was not a violation of the Court's orders because such orders "merely required that Shekar return the iphone." (*Id.* at 10.) Such an argument is unavailing. Courts may not expand the terms of an

---

[12] Shekar's brief also contains hints that seem to admit his story of removing the passcode is a lie. He justifies his delay in turning the phone over by asserting that he did not wish to do so "without protecting and securing the evidence in the phone." (Def.'s Rule to Show Cause Brief, Dkt. # 107, at 6.) As he has insisted that he did nothing else to alter the phone or copy the data on it, the natural inference is that he protected and secured his evidence by making sure Teledyne was unable to access it. He also lets slip in his brief that Teledyne could not have been prejudiced by his late production of "an unusable iphone" – and of course the phone would only be unusable to Teledyne if he had locked it. (*Id.*)

[13] The affidavit of Shekar's attorney does not prove that the iPhone had no passcode protection, as the Court is well aware from personal experience that iPhones can be configured to remain unlocked for various periods; Borcia's affidavit is not inconsistent with the possibility that Shekar was able to open the phone without a code because he had entered the code earlier and insufficient time had elapsed for the phone to re-lock.

order in contempt proceedings, but the terms are nonetheless "subject to reasonable interpretation in light of the background of the order and the purpose for which it was entered." *See United States v. Greyhound Corp*., 508 F.2d 529, 532-37 (7th Cir. 1974) (explaining that a party cannot evade a finding of contempt by "twisted interpretations or tortured constructions of the provisions of the order") (quotation marks omitted). Given that this suit arose from Teledyne's fear that Shekar misappropriated its confidential information, the purpose of the TRO and PI was clearly to facilitate an investigation into what information Shekar possessed and what he did with it. Permitting Shekar to return Teledyne's devices in a totally inaccessible state would unquestionably frustrate this purpose. *See Grove Fresh Distributors, Inc. v. John Labatt Ltd*., 888 F. Supp. 1427, 1438 (N.D. Ill. 1995) (in contempt proceedings, "a court should not interpret the order in such a way as to render it a nullity"). Accordingly, Shekar's production of Teledyne's iPhone without disclosing the correct passcode necessary to access it was a violation of the TRO and PI and constitutes another instance of contempt.

*4: Shekar's failure to turn over all Teledyne information in his possession*

   In addition to requiring Shekar to turn over any devices in his control, the TRO and PI also commanded that he turn over "all information, data, files, and other Teledyne property." Shekar has insisted throughout these proceedings that he has no Teledyne files or other information. (*See, e.g*., Apr. 30 Tr., 36:2-6; Def.'s Ex. 1, ¶ 7.) As discussed more fully above, the forensic evidence produced at the hearing showed that Shekar's Teledyne laptop was backed up onto a Seagate-brand external hard drive, and that this hard drive was not the blank, unused drive Shekar ultimately produced prior to the hearing. Shekar has neither produced the hard drive

containing the backup files nor accounted for its whereabouts, and because it contains Teledyne files and information he was obligated by the TRO and PI to do so.

In addition to this failure, Teledyne identifies two other instances in which it believes Shekar has failed to turn over Teledyne information. First, despite his multiple assertions that he has no Teledyne emails or files, Shekar offered as an exhibit at the show cause hearing an email between himself and another Teledyne employee discussing non-disclosure agreements with clients. (Def.'s Ex. 3.) This email falls under the TRO and PI's broad requirement that he turn over all Teledyne "information," a category that certainly includes internal Teledyne communications concerning sensitive business matters. Shekar justifies this instance of noncompliance by relying on his familiar argument that the email wasn't relevant and that Teledyne was not harmed by his failure to produce it, insisting that the email was an "internal communication" that was "no secret" and was already accessible to Teledyne through its email servers. (Def.'s Rule to Show Cause Brief, Dkt. # 107, at 13-14.) This is likely true, but irrelevant. Once again, it is not up to Shekar to determine what materials the Court *should* have ordered him to produce – he is obligated to produce everything specified in the Court's orders whether or not he believes it relevant to Teledyne's lawsuit. Moreover, as Shekar was well aware, the orders did not require him to turn over Teledyne information because the company would otherwise lose it. They required it because Teledyne had made a sufficient showing that Shekar attempted to misuse such information after his termination, and the Court deemed it necessary to terminate Shekar's access to the confidential information of his ex-employer. That Shekar had – and failed to turn over or even disclose – this email also suggests that he likely has other Teledyne communications, despite his difficult-to-credit assertion that he printed out this particular email (and no others) prior to his termination and just happened to hold onto it.

Second, Roffman testified that records from Teledyne's servers showed a data transfer between the servers and Shekar's Teledyne laptop throughout the day on the date of his termination. (Apr. 30 Tr., 95:18- 96: 17.) While it is unclear what data exactly was transferred to the laptop, it is clear that Shekar has not turned it over because he persists in claiming he has no such data. Shekar insists that under Teledyne's policy, he was locked out of the company's server as soon as he was terminated and as such could not have downloaded files on February 3. Teledyne's network has a 15-minute lockout policy, meaning that the Teledyne laptop would have been disconnected from the network after 15 minutes of idleness and the user would have to use his or her Teledyne credentials to log back on. (Compl., Dkt. # 1 at ¶ 23.) Shekar suggests that because of this policy, he could not have accessed files on Teledyne's network after his termination as the company would have invalidated his login credentials as soon as it fired him. In support of his contention that a data transfer between his laptop and the server was impossible, Shekar offers a photograph that purports to be a screenshot showing that Teledyne's servers were "X-ed out" from his computer's directory on 9:28 a.m. on February 3. (Def.'s Ex. 2.)

The photograph Shekar presented has not, however, been in any way authenticated; there is no evidence beyond Shekar's own assertions that it is actually a screenshot, that it is actually of his Teledyne laptop directory, that it was taken when he claims it was, or that the presence of an X next to a Teledyne icon truly means the laptop could not access the network. Moreover, the picture is so fuzzy as to be completely illegible; it is impossible to read the names of the icons that Shekar insists relate to the Teledyne network, or to tell whether they are actually "X-ed out" as he claims. Furthermore, when shown the image at the show cause hearing, Roffman testified that he could not tell from the image alone whether the shortcuts in the photo could be accessed at the time it was taken. (Apr. 30 Tr., 81:25-82:18.) Moreover, Roffman testified that a user will

often continue to have access to a server for some time after the disabling process has begun. (*Id.* at 91:9-14.) Teledyne's complaint alleges that Shekar's network access was flagged as disabled starting at 12:09 p.m. on the date of his termination, and that due to the number of servers Teledyne employs Shekar's account was not finally terminated until 8:08 p.m. (Compl., Dkt. # 1, ¶ 42.) This specific allegation of the complaint was verified under penalty of perjury by Teledyne's Director of Information Technology Infrastructure. (*Id.* at p. 32.) Accordingly, no evidence supports Shekar's assertion that he was locked out of the network starting at 9:28 a.m. Roffman's testimony as to the data transfer that day between Shekar's laptop and the server is accordingly unrebutted, and Shekar is in contempt for having failed to turn over or otherwise account for the data he accessed on February 3, 2015.

*5: Shekar's failure to provide complete and truthful interrogatory responses*

The TRO and PI both required Shekar to provide verified interrogatory responses within five days of the issuance of each order, in which he was to specifically identify:

> computers, hard drives, servers, disk drives, flash drives, cellular telephones, cds, dvds, usb drives, and any other devices that can be used to electronically store data or information that are (i) currently accessible by [Shekar] or in [Shekar's] possession, custody or control, or (ii) have been accessible by [Shekar], or in [Shekar's] possession, custody or control, at any time since July 1, 2013… The interrogatory responses must also specify all passcodes, passwords, or decryption keys necessary to access and examine such devices and systems.

(TRO, Dkt. # 16 at 4; PI, Dkt. # 62 at 7.) The day before the show cause hearing (seven weeks after the PI issued), Shekar finally provided such interrogatory responses to Teledyne. (Pl.'s Ex. 1.) In response to the interrogatory asking about currently accessible devices, Shekar responded "None." In response to the interrogatory asking about devices accessible since July 1, 2013,

Shekar identified only his Teledyne laptop, his Teledyne iPhone, and Teledyne's server. He specified "2325" as the passcode for the iPhone.

As discussed at length above, all three of these responses were untrue. Shekar does not contest that he owns a home computer. Thus, even if he has rid himself of all other devices, his answer that he could access *no* computers or devices was patently false. Shekar justifies this omission by insisting that he had no devices "which have any Teledyne information" and asserts that "[b]y virtue of that answer to the first question, the rest of the interrogatories are moot." (Def.'s Rule to Show Cause Brief, Dkt. # 107, at 6.) The orders contained no limitation that he only need turn over devices with Teledyne information, and Shekar was not free to decide for himself either what devices were relevant or whether his answer to one interrogatory relieved him of the obligation to truthfully answer all others. Furthermore, as discussed above, the forensic examination of the laptop image proved that 11 external hard drive or flash drive devices had been used in conjunction with the laptop since July 2013. Shekar failed to identify any of these as devices. Finally, the passcode Shekar offered was not the one protecting the iPhone. As Shekar provided incomplete or false answers to at least three interrogatories, he is in contempt of this portion of the TRO and PI.


*6: Shekar's alteration of evidence*

Teledyne argues that if the Court credits Shekar's assertion that he removed the iPhone passcode prior to turning it over, this violated the PI's command that Shekar not "alter" any of the devices or equipment relevant to this case. It is unnecessary to decide this question because as noted above, the Court does not credit Shekar's testimony that he removed the iPhone passcode and therefore no alteration has been proved.

*7: Shekar's failure to submit a truthful declaration of compliance*

The TRO and PI both contained a provision requiring Shekar to provide a declaration of compliance within five days of service of the orders, and it is uncontested that he did not do so.[14] He filed a declaration of compliance almost two months late on the day before the show cause hearing, in which he stated that he had complied with the PI's requirements regarding turning over all devices and information in his possession. (Pl.'s Ex. 2.) He also declared that the portions of the orders requiring him to preserve and not alter relevant evidence were "not applicable" to him.

As the preceding discussion of Shekar's noncompliance makes clear, these representations were lies. Shekar did not comply with the relevant portions of the TRO and PI, and his assertions to the contrary are therefore false. Specifically, he did not turn over his home computer for inspection, produce the external hard drives that forensic analysis indicated he had used with the laptop, or return and delete all copies of Teledyne's emails and other files. While Teledyne points out in its brief several factual points on which Shekar's various declarations and affidavits throughout the case conflict with each other and with his testimony at the hearing, it is unnecessary to wade into such matters here. It suffices to recognize that Shekar was obligated to provide a timely and truthful declaration of compliance, and instead provided a false and incomplete declaration several weeks late. The Court accordingly finds Shekar in contempt for this violation of the TRO and PI.

---

[14] Shekar filed a document styled "Statement of Compliance by Raj Shekar of the Temporary TRO" on March 3, but this was well outside the 5-day deadline. (Dkt. # 46.) In addition, this statement did not certify that Shekar had fully complied with the mandates of the TRO but rather provided various arguments why he should not be required to, including that he need not return Teledyne's property because its "depreciated" value rendered it essentially worthless. This statement did not satisfy his obligations under the TRO.

<u>SANCTIONS</u>

Having now found Shekar in civil contempt for violating the TRO and the PI in the six ways detailed above, the Court turns to the appropriate sanction. When an individual is in contempt of a court order, the court may impose civil sanctions not to punish the contemnor but to coerce compliance with the order and compensate parties for harm suffered as a result of the non-compliance. *See United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947). A court has broad discretion in devising sanctions in a contempt proceeding. *See Dowell*, 257 F.3d at 694. Appropriate sanctions for civil contempt can include attorneys' fees and costs and fines. *See S. Suburban Hous. Ctr. v. Berry*, 186 F.3d 851, 854 (7th Cir. 1999). Coercive imprisonment is also an available remedy for civil contempt. *See In re Grand Jury Proceedings*, 280 F.3d 1103, 1109 (7th Cir. 2002); *Anthony Marano Co. v. A. Stallone, Inc*., No. 00 C 8019, 2002 WL 31875471, at *7 (N.D. Ill. Dec. 24, 2002) (noting that in civil contempt proceedings, "[t]he remedy may include imprisonment"). However, "civil contemnors, unlike their criminal counterparts, 'hold the key of their prison in their own pockets'" because they can secure their immediate release by obeying the court's orders and purging their contempt. *In re Grand Jury Proceedings of Dec., 1989*, 903 F.2d 1167, 1169-70 (7th Cir. 1990) (quoting *In re Nevitt,* 117 F. 448, 461 (8th Cir. 1902)).

Teledyne requests only that "the Court enter an order directing Shekar to immediately comply with the Preliminary Injunction" and for Shekar to be fined and to bear Teledyne's fees and costs. (Pl.'s Rule to Show Cause Brief, Dkt. # 96, at 13-14.) In light of Shekar's unfailingly contumacious disregard for the authority of the Court throughout this case, it is unlikely that such a sanction will be sufficient. Shekar has been ordered time and again to comply with the Court's orders and has never manifested the slightest intention to do so. Even more, he has, as pointed

out above, attempted to deceive the Court at every step of the way. He has demonstrated a total lack of respect for the truth in all phases of this litigation, from his denial of having received notice to the many factual contradictions inherent in his own filings and his false testimony under oath. Nor is this contumacious conduct new or naive. Shekar is a restricted filer in this district, having filed numerous pro se cases that were dismissed for failure to state a claim, lack of jurisdiction, failure to pay the filing fee, or similar reasons; the dockets of those cases reveal conduct very similar to that which Shekar has engaged in before this Court. *See, e.g.*, CEGA v. Johns, No. 1:11-cv-09209 (Dec. 27, 2011); Shekar v. American Family Mutual Ins., No. 1:11-cv-02757 (Apr. 26, 2011); Shekar v. Fitzgerald, No. 1:06-cv-03433 (June 23, 2006).

It is not likely that another stern warning, even one bolstered by monetary penalties, will result in compliance. Nevertheless, Teledyne is not seeking coercive incarceration and incarceration should be a last resort. Imprisonment for civil contempt is a drastic remedy. Shekar, however, should be under no misapprehension as to the Court's willingness to impose such a remedy since the proceedings have already made clear that it is most likely the only method by which he can be motivated to comply. Shekar has until July 1, 2015 to totally and completely purge himself of his contempt or face imprisonment. He can do so only by fully complying with all of the PI's commands. Specifically, he must: (1) produce his home computer and any other devices or electronic storage media accessible to him[15]; (2) produce at a minimum the three external hard drives connected to the Teledyne laptop on or after his termination date, and either produce or account for the whereabouts of the other eight hard drives or other devices which have connected to the laptop since July 13, 2013; (3) truthfully and completely answer all

---

[15] Shekar is admonished yet again that this category is to be construed broadly, and covers not only computers and external hard drives but also USB flash drives, tablet computers, smart phones, and CDs or DVDs capable of storing electronic data. That he believes such items irrelevant or that they are also used by his family is no excuse for failing to produce them.

interrogatories served upon him in this matter under oath; (4) turn over, without keeping any copies, all Teledyne information including emails and the November 2014 backup files; (5) explain the nature of the February 3, 2015 data transfer between Teledyne's servers and his work laptop, and turned over any such data still accessible to him; and (6) truthfully divulged the passcode required to access the Teledyne iPhone he previously produced.

## CONCLUSION

Raj Shekar is hereby ordered to purge himself of contempt by doing the following on or before July 1, 2015 or face further sanctions: (1) produce his home computer and any other devices or electronic storage media accessible to him[16]; (2) produce at a minimum the three external hard drives connected to the Teledyne laptop on or after his termination date, and either produce or account for the whereabouts of the other eight hard drives or other devices which have connected to the laptop since July 13, 2013; (3) truthfully and completely answer all interrogatories served upon him in this matter under oath; (4) turn over, without keeping any copies, all Teledyne information including emails and the November 2014 backup files; (5) explain the nature of the February 3, 2015 data transfer between Teledyne's servers and his work laptop, and turned over any such data still accessible to him; and (6) truthfully divulged the passcode required to access the Teledyne iPhone he previously produced.

In addition, Teledyne is awarded all of its reasonable attorney's fees and costs incurred in the preparation and prosecution of its motion for a rule to show cause and its post-hearing briefs.

Finally, for the reasons given above, Shekar's motion to vacate the PI is denied.

---

[16] Shekar is admonished yet again that this category is to be construed broadly, and covers not only computers and external hard drives but also USB flash drives, tablet computers, smart phones, and CDs or DVDs capable of storing electronic data. That he believes such items irrelevant or that they are also used by his family is no excuse for failing to produce them.

Teledyne is ordered to appear through counsel and Shekar is ordered to appear before this

Court in person to report on compliance with this order on July1, 2015, at 9:30 a.m.


**SO ORDERED.**                                    **ENTERED:   June 17, 2015**

_____
**HON. RONALD A. GUZMAN**
**United States District Judge**