**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **Teledyne Technologies, Inc.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 15-cv-1392** |
| **v.** | ) | |
| | ) | **Judge Ronald A. Guzmán** |
| **Raj Shekar,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**ORDER**

Teledyne's motion for attorney's fees [259] is granted in part. Teledyne is entitled to
$366,956.18 for fees and costs pertaining to Shekar's contemptuous behavior. Shekar's motion
to set Teledyne's damages at zero [280] is denied. Additionally, Teledyne is entitled to (1)
$549.00 for the cost of its projector and an additional $1,098.00 in punitive damages for its
conversion claim, (2) $5,817.50 in damages on its Computer Fraud and Abuse Act claim, (3) a
permanent injunction as discussed in this opinion, (4) an additional $67,196.70 in attorney's fees
based on its Illinois Trade Secrets Act claim and its Illinois Uniform Deceptive Trade Practices
Act claim, and (5) the release of its $10,000 surety bond. The precise damages regarding
Teledyne's trade secrets claim, however, cannot be determined on this record. A status hearing is
set for 5/15/17 at 9:30 a.m. to determine how the parties wish to proceed with ascertaining those
damages. Teledyne is further ordered to submit a proposed permanent injunction order to the
Court's inbox within ten days.

**STATEMENT**

There are two related issues before the Court: (1) a motion for attorney's fees by plaintiff Teledyne Technologies, Inc. ("Teledyne"); and (2) a motion by defendant Raj Shekar ("Shekar") to set Teledyne's damages at zero dollars. The Court will address each in turn.

I.      **Background**

In brief, the origin of this dispute stems from Shekar's termination as a Teledyne employee, after which he stole Teledyne property (both physical and digital). The case soon spiraled into contentious litigation regarding Shekar's obstinate refusal to comply with the Court's preliminary injunctive rulings. (*See, e.g.,* 6/17/15 Mem. Op. & Order [Dkt. # 113]) (directing Shekar to purge himself of contempt). The principal theme of Shekar's misconduct is that despite repeated directives from his many attorneys and the Court (including a temporary restraining order and an injunction),[1] he failed to produce various items critical to this litigation, such as hard drives and USB drives, which either belonged to Teledyne or contained Teledyne's data.

Shekar's failure to produce is only part of the picture, though. Throughout this litigation, he routinely denied the existence and his possession of those items, despite ample forensic evidence to the contrary. And he further attempted to dodge responsibility for his failure to produce by lying to the Court and Teledyne on many, many occasions (both in person and through his submissions). The result was a lengthy and unjustifiable delay in this case, which not only wasted the Court's time but also imposed astronomical costs upon Teledyne. The Court was thus left with little choice but to impose extreme remedial sanctions: it entered judgment against Shekar, dismissed his counterclaims, and ordered him to pay all of Teledyne's reasonable

---

[1] (*See* TRO [Dkt. # 16]; PI [Dkt. # 62].)

attorney's fees associated with litigating his contemptuous behavior.[2] (*See* 8/22/16 Mem. Op. & Order [Dkt. # 247].)

**Teledyne's Motion for Attorney's Fees**

## I.    Legal Standard

District courts' inherent powers include "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers* v. *NASCO, Inc.*, 501 U. S. 32, 44-45 (1991). One such sanction is an assessment of attorney's fees "instructing a party that has acted in bad faith to reimburse legal fees and costs incurred by the other side." *Id*. The fee award may go no further than redressing the wronged party for loses caused by the contemptuous conduct; that is, it may not impose an additional amount as punishment for the sanctioned party's misbehavior. *Goodyear Tire & Rubber Co. v. Haeger*, No. 15-1406, slip op. at *13 (S. Ct. Apr. 18, 2017).

To that end, the most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). This is known as the "lodestar method,"

---

[2] It is worth noting that these sanctions were imposed as a last resort. After the initial contempt finding, the Court spent months admonishing Shekar of the potential consequences of his actions, all the while he continued to put forth meritless, shifting stories to justify his noncompliance. By the end of 2015, however, the Court had had enough and ordered compulsory incarceration — a penalty that seemed to resonate with Shekar. Immediately after that order was entered, Shekar caused outside counsel to call and inform the Court of serious concerns regarding Shekar's health should the order of incarceration be executed. Shekar was called to a status hearing the next day. There, he informed the Court of certain confidential difficulties in his life and asked to be given one last chance to comply. The Court granted that request out of concern for Shekar's well-being and in the hopes that he would see the error of his ways. But he did not. Instead, he persisted in the same dishonest behavior that landed him in contempt in the first instance, which resulted in months of back-and-forth status hearings, thereby extending the span of the contempt proceedings to the better part of a year. It thus became clear to the Court that there was no getting through to Shekar, and that he would never litigate this case in good faith.

which the Seventh Circuit has described as the "centerpiece" of attorney's fees determinations. *Pickett v. Sheridan Health Care Ctr.*, 644 F.3d 632, 639 (7th Cir 2011) (citations omitted). Fees calculated according to the lodestar method carry a strong presumption of reasonableness. *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992). Nonetheless, the Court may adjust the lodestar amount based on considerations unique to the case, such as:

> (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorneys due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (8) the amount involved and the results obtained; (9) the experience, reputation, and abilities of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the clients; and (12) awards in similar cases.

*Flanagan v. Office of Chief Judge*, 664 F. Supp. 2d 662, 668 (N.D. Ill. 2009).

## II.    Analysis

Teledyne requests a total fee award of $348,640.20 for its attorney hours, paralegal hours, costs, and expert fees, all of which were incurred through litigating Shekar's contempt (exclusive of the fees related to preparing the instant motion).[3] Shekar, of course, challenges the extent of these fees and their reasonableness, but his arguments are generalized, scattered, and largely unsupported by any law or reference to the record in this case. The Court will therefore begin the analysis with the fundamentals (hourly rate and hours billed) and then turn to Shekar's particular claims.

### (A)    *Hourly Rates*

---

[3] Winston & Strawn staffed three attorneys and one paralegal on this case: Aviva Grumet-Morris, lead counsel and partner with ten years of experience; John M. Dickman, an associate with twenty-four years of experience; Benjamin Ostrander, an associate with three years of experience; and Carol Abing, a paralegal with thirteen years of experience. (*See* Grumet-Morris Decl. [Dkt. #259-1] at 6.)

The hourly rate used in calculating the lodestar is determined based on the market rate for counsel's services. *Missouri v. Jenkins*, 491 U.S. 274, 283 (1989). The party seeking fees has the burden of proving the attorneys' market rates. *Tolentino v. Friedman*, 46 F.3d 645, 652 (7th Cir. 1995). The presumptive market rate is the rate the attorney could earn for comparable work from fee-paying clients. *People Who Care v. Rockford Bd. of Educ.*, 90 F.3d 1307, 1310 (7th Cir. 1996). A fee petitioner may demonstrate an attorney's market rate by showing that clients have actually paid that rate. *Cintas Corp. v. Perry*, 517 F.3d 459, 469-70 (7th Cir. 2008). Alternatively, the appropriate market rate can be determined by the rate that lawyers of similar ability and experience in the community normally charge for similar cases. *Gautreaux*, 491 F.3d at 659. Once the fee petitioner provides evidence establishing the attorneys' market rate, the opposing party has the burden of demonstrating why a lower rate should be awarded. *Id.* at 659-60.

Here, Teledyne's attorneys each billed the same hourly rate of $441.00. The paralegal billed $265.50 per hour. Both rates are lower (if not substantially lower) than the prevailing median market rate for large national law firms like Winton & Strawn.[4] Teledyne, moreover, is a repeat customer for Winston & Strawn, and it has actually paid these discounted rates. (*See* Grumet-Morris Decl. [Dkt. # 259-1] at ¶ 8.) Taken together, these points strongly suggest that counsels' rates are reasonable, and indeed, Shekar does not challenge them. *See Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp.,* 73 F.3d 150, 153 (7th Cir. 1996)("[T]he best evidence of the market value of legal services is what people pay for it."). Instead, he claims only that the paralegal rate is excessive because (1) "it is an administrative cost that should be billed

---

[4] In her declaration, Ms. Grumet-Morris cites the PricewaterhouseCoopers Billing Rate & Associate Survey for 2015-16, which lists the following rates: equity partner ($898.00-$926.00/hr); associate ($591.00-$601.00/hr); and paralegal ($283.00-$299.00/hr). Shekar does not challenge the accuracy of these figures. (Grumet-Morris Decl. [Dkt. # 259-1] at 6.)

to Teledyne" and (2) it is higher than what many attorneys themselves bill in the greater Chicago area. (Shekar's Sur-Reply [Dkt. # 279] at 9.)

This argument fails for at least three reasons. First, courts routinely award paralegal fees as part of an attorney's fee award: the relevant consideration for awarding those fees is simply "whether the work was sufficiently complex to justify the efforts of a paralegal, as opposed to an employee at the next rung lower on the pay-scale ladder." *See People Who Care,* 90 F.3d at 1315. Teledyne's petition is sufficient in this regard. The entries for paralegal time indicate that the tasks performed involved reviewing briefs and case law, preparing exhibits for briefs, comparing Shekar's appellate motions with those filed before this Court, and supplementing briefs with record cites. (*See* Hours Log [Dkt. # 259-1].)

Second, as noted above, Teledyne has actually paid that paralegal rate, and similar law firms charge similar rates for their paralegal services, (*see* Grumet-Morris Decl. [Dkt. # 259-1] at 6-7), which leaves the Court satisfied that the requested paralegal rate is reasonable. Accordingly, the burden is now on Shekar to rebut that finding, which he has not done: his two-sentence objection to Teledyne's paralegal rate is both unsubstantiated and waived, since he raised it for the first time in a sur-reply brief. *See Carter v. Tennant Co.*, 383 F.3d 673, 679 (7th Cir. 2004). As such, the Court concludes that both the attorney rate and paralegal rate requested by Teledyne are reasonable.

**(B)** *Hours Reasonably Expended*

An attorney's total time spent on a matter is similarly subject to judicial scrutiny. *People Who Care*, 90 F.3d at 1314. Counsel for the prevailing party is expected "to make a good-faith effort to exclude . . . hours that are excessive, redundant, or otherwise unnecessary, just as a

6

lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley*, 461 U.S. at 434.

After a careful review of Teledyne's fee petition, the Court is satisfied that the 448.7 attorney hours and 10.3 paralegal hours expended by counsel were reasonable. Shekar's contemptuous behavior, both before this Court and his appeals to the Seventh Circuit, has been virtually the sole focus of this case since its inception. Teledyne was thus forced to litigate on two fronts for more than a year. Teledyne's fee petition, moreover, reflects that the tasks performed pertained solely to Shekar's contempt and that the time spent on those tasks was reasonable. Although Shekar argues to the contrary, it is telling that he fails to highlight any specific portions of the billing entries that are unjustified, that would normally not be billed to a paying client, or that are delegable to non-professionals. Nor has he specified any entry that he believes to be duplicative. Instead, his responses are replete with unsubstantiated conclusions, such as:

> With respect to the time entries of Ms. Grumet-Morris and Mr. Ostrander, it becomes readily apparent after reading through them, that they are essentially doing the very same work. The only difference is that Mr. Ostrander has billed a substantially lower number of hours . . . than his colleague. (Shekar's Response [Dkt. # 274] at 4.)

> With respect to Ms. Grumet-Morris's time entries, she billed more than 300 hours [on] these matters. . . . However, in light of the nature of the tasks being executed, Ms. Grumet-Morris's reasonable and recoverable time for the purposes of this Court's fee Petition analysis should be substantially less than 311 hours, and more in the range of 20 to 25. (*Id.* at 5.)

These boilerplate objections provide no basis for the Court to reduce Teledyne's fees. *See Valerio v. Total Taxi Repair & Body Shop, LLC,* 82 F. Supp. 3d 723, 742-43 (N.D. Ill. 2015) (rejecting an argument that counsel's hours were excessive where the opposing party provided no comparison to gauge the reasonableness of those hours); *Michiana Dairy Processors, LLC v.*

*All Star Bev., Inc.*, No. 2:09-CV-39-PRC, 2011 U.S. Dist. LEXIS 35162, at *26-27 (N.D. Ind. Mar. 31, 2011) (explaining that the opposing party needs to support its objections to a fee petition by identifying specific entries that are excessive or unjustified). That said, Shekar makes a litany of other arguments, which the Court will address in turn.

(i)     Limiting Teledyne's Fees to its Prior Demand

First, and perhaps most puzzling, Shekar insists that Teledyne's fees and costs should be limited to those incurred as of June 22, 2015 — when Teledyne initially demanded payment for attorney's fees after the Court's first show-cause ruling (roughly $75,000). On Shekar's account, he "should have been able to rely upon this to cut his losses [throughout the rest of this litigation]." (Shekar's Response [Dkt. # 274] at 6.) This argument is hard to swallow.

Above all, Shekar has offered no principled reason or case law supporting this relief, which would essentially amount to an arbitrary reduction in fees and a wholesale disregard of a year's worth of work by Teledyne's counsel. Second, and more fundamentally, Shekar's misconduct — and *only* his misconduct — is to blame for the fees incurred after June 2015. Indeed, the Court itself warned him of these consequences early on:

> I have spent a great deal of time and the Court's resources dealing with [Shekar's] many lies. I have actually bent over backwards to keep from having to execute a coercive incarceration on your client because I find that to be an extreme measure in a civil case . . . . I want you to have a nice long talk with your client before you [file any further submissions or request additional hearings because], if it turns out that his denials are not valid, I am going to sanction him.

(7/1/15 Hr'g Tr. [Dkt. # 198] at 16-17.) And these warnings continued throughout the course of this case. *See, e.g.,* (2/11/16 Hr'g Tr. [Dkt. # 227] at 12) ("I've given Mr. Shekar months and months and months [to demonstrate compliance with my orders]. And every time counsel shows up here, her client [Teledyne] has to pay her money, and she comes from a firm that charges a lot of money. So we need to get this done."). Thus, Shekar cannot credibly claim to have relied upon

8

Teledyne's June 2015 demand as a limit on its future attorney's fees, nor can he claim to be surprised by the reality that those fees increased exponentially due to a year of unnecessary and protracted litigation. The Court therefore declines to reduce Teledyne's fees on this basis. *See People Who Care,* 90 F.3d at 1314 (7th Cir. 1996) (recognizing that courts may not arbitrarily reduce a fee request).

(ii) <u>Shekar's Good Faith Efforts to Comply</u>

Next, Shekar suggests that he should not be penalized for his post-June-2015 attempts to comply with this Court's orders. He argues, essentially, that in the face of a contempt order, he was "forced" to defend himself and provide his own forensic evidence, explanations, and certifications of compliance, all of which were given in good faith. That Teledyne had to expend resources responding to these matters is simply endemic to the adversary process (at least according to Shekar). The Court finds otherwise.

Apart from providing no authority for this position, Shekar's argument rings hollow in this instance because virtually none of his litigation behavior (including the present argument) has been in good faith. In fact, it is his persistent bad faith that created this situation, and he must now accept the consequences of his actions.

(iii) <u>Shekar's Opportunities to Make a Case for Himself</u>

In an equally puzzling fashion, Shekar insists that the Court failed to give him sufficient opportunities to conduct discovery in order to support his defense. This could not be further from the truth. The only example he cites is a motion for discovery filed more than eight months after the initial finding of contempt. As explained in the order denying his motion:

> In his motion for discovery, [Shekar] seeks to depose the [Teledyne's] expert who testified at the rule to show cause hearing and [Teledyne's] Director of Information Technology. He claims that at a minimum, due process requires that he be allowed to take these depositions now. He does not address why discovery

> was not taken months ago prior to the issuance of the preliminary injunction, or by his first attorney Mr. Borcia prior to, or during, the proceedings in the original rule to show cause hearing, or in subsequent proceedings challenging the Court's contempt order by his second attorney, Mr. McGurk, or by his third attorney, Mr. Ziccardi. If [Shekar[ has not deposed these witnesses, it is not because he was denied the opportunity to do so, but because three different attorneys determined they did not need to.

2/16/16 Order [Dkt. # 223] at 1-2.) Simply put, Shekar has had ample opportunity to conduct discovery in this case despite the *uncontroverted* evidence from Teledyne that showed his ever-changing theories of compliance to be meritless. His present argument, which suggests that the Court obstructed his ability to make a case for himself, fits the same mold.

(iv)    <u>Teledyne's Damages</u>

Shekar's next argument is easily dismissed. He claims that Teledyne's fees should be reduced because Teledyne has not suffered any damages. The substance of this claim will be addressed later in this opinion, but for the purposes of the instant fee petition it is simply misguided. Apart from Shekar's failure to cite any evidence to support this fact-sensitive claim (namely, that no damages were suffered), the present issue has nothing to do with the merits of Teledyne's causes of action. It concerns the Teledyne's arduous efforts in litigating Shekar's contemptuous behavior. Whether Teledyne actually suffered damages as alleged in its complaint is therefore irrelevant. *See EEOC v. Dial Corp.,* Civ. A. No. 99 C 3356, 2001 U.S. Dist. LEXIS 24522, at *27 (N.D. Ill. Nov. 29, 2001) ("An award of costs and attorney fees in civil contempt is clearly proper and wholly independent of an award of compensatory damages.") (citation omitted).

(v)    <u>Appellate Fees</u>

In terms of appellate fees, Shekar claims (without specifying) that Teledyne's appellate fees did not "arise out of any contempt proceeding in this court," and that in any event, only the Seventh Circuit can award appellate fees. (Shekar's Sur-Reply [Dkt. # 279] at 8.) Not so.

Apart from being waived, since he first raised this issue in a sur-reply brief, Shekar ignores that district courts do indeed award appellate fees to prevailing parties. *See, e.g,. Young v. Verizon's Bell Atl. Cash Balance Plan*, 783 F. Supp. 2d 1031, 1039 (N.D. Ill. 2011) (awarding attorney's fees for hours spent on both matters before the district court and the Seventh Circuit); *Chrysler First Fin. Serv. v. Gray*, 96 C 7117, 1999 U.S. Dist. LEXIS 7787, at *31-32 (N.D. Ill. Mar. 31, 1999) (noting that the Seventh Circuit has expressed "a reluctance to grant appellees additional fees and costs . . ., but [it has] not announce[d] a rule that fees from appeals of judgments of civil contempt should not be taxed to the contemnor"). Although Teledyne is technically not a "prevailing party," since the Seventh Circuit eventually dismissed the appeal for lack of jurisdiction, the fact remains that (1) the court ordered Shekar to pay for all of Teledyne's attorney's fees *caused* by his misconduct, (2) Teledyne would not have incurred its appellate costs but for Shekar's misconduct, and (3) the proceedings in that appeal are now over. *See Fox* v. *Vice*, 563 U. S. 826, 836 (2011) ("That kind of causal connection, as this Court explained in another attorney's fees case, is appropriately framed as a but-for test: The complaining party . . . may recover . . . the portion of his fees that he would not have paid but for the misconduct."); *Divane v. Krull Elec. Co.*, 319 F.3d 307, 314 (7th Cir. 2003) ("[T]he proponent of a sanctionable position ultimately pays the costs resulting from it, serving a dual purpose of deterrence and restitution. . . . [E]ssentially, the analysis is a matter of causation.").

Put differently, had Shekar simply complied with the Court's orders to begin with, or at least not contested the validity of those orders on appeal, Teledyne would not have had to spend

11

a year litigating this case on another front.[5] Accordingly, given that (1) Shekar has waived his argument about appellate fees, (2) Teledyne has shown its fees to be presumptively reasonable and the product of litigating Shekar's contempt, and (3) Shekar has not specified any particular entry in Teledyne's appellate fee log that is objectionable, the Court will permit Teledyne to recover its appellate fees in full.

          (vi)    <u>Block Billing</u>

Here, Shekar comes close to a meritorious argument by suggesting that the attorney time block-billed by Mr. Ostrander should be disallowed. Although some courts have reduced or denied requests for block-billed fees, it is not necessarily a prohibited practice. *See Farfaras v. Citizens Bank and Trust of Chicago*, 433 F.3d 558, 569 (7th Cir.2006). In this instance, Mr. Ostrander's entries are sufficiently detailed to permit the Court to determine the reasonableness of his fees. (*See*, *e.g.* Appellate Fee Log [Dkt. # 259-5] at 6) ("B. Ostrander: Review motion to supplement the record; review transcript of February 18 district court hearing; review and revise correspondence to Shekar's counsel requesting correction of misrepresentation in appellate brief; correspondence with A. Grumet-Morris re same. 0.4 [hrs]."). His entries indicate the tasks performed, the people involved, the time allocated, and they provide the Court with an understanding of the subject matter, which is all that is required. *See Hensley*, 461 U.S. at 437 n.12. Shekar's generalized block billing objections, moreover, are untethered to any particular time entry submitted by Mr. Ostrander, so his argument fails. *See Baier v. Rohr-Mont Motors, Inc.*, 175 F. Supp. 3d 1000, 1024 (N.D. Ill. 2016) (declining to reduce fees where the party opposing the fee award offered only generalized arguments about block-billing).

---

[5] The appeals process spanned more than a year (June 2015 through August 2016), and the appellate docket reflects multiple emergency motions by Shekar to stay the proceedings in the district court, as well as lengthy, complicated briefs on Shekar's compliance with this Court's orders. (*See* COA Dkt., Case No. 15-2349.)

(viii)    Other Factors

Lastly, relying on *E.E.O.C. v. New Indianapolis Hotels, LLC*, No. 1:10-CV-1234-WTL-DKL, 2015 WL 7016487, at *1 (S.D. Ind. Nov. 9, 2015), Shekar contends that in addition to the reasonableness of the fees, the Court should consider other factors such as his financial status, which he attests is in dire straits (albeit without supporting financial documents). (*See* Shekar's Sur-Reply [Dkt. # 279] at 9.) But this argument hinges on Shekar's credibility, which is in the negative at this point. Furthermore, Shekar conspicuously omits other factors in the *New Indianapolis Hotels* analysis, particularly the extent to which the contemnor willfully disregarded the court order. *See* 2015 WL 7016487, at *1. That factor alone militates in favor of compensating Teledyne in full, since Shekar's willful contempt was nothing short of utter disrespect for the judicial process.

Accordingly, the Court finds Teledyne may recover for all of its attorney's fees and paralegal fees pertaining to Shekar's contempt, totaling $303,150.60.

**(C)**    *Costs*

In addition to its attorney time, Teledyne also seeks reimbursement for costs associated with litigating Shekar's contempt, which include forensic expert fees ($43,985.50), copies ($130.80), transcripts ($1,074.00), postage ($70.55), subpoenas ($175.00), and transportation ($53.75). These costs are recoverable and reasonable.

Throughout the course of this case, Teledyne hired several experts from FTI Consulting. These experts testified in-person and submitted several declarations regarding the litany of technical issues involved with Shekar's frivolous filings and constantly-shifting positions (such

13

as whether he connected certain USB drives to an external hard drive, or whether he produced a "sham" laptop as evidence of his compliance with the Court's orders). After reviewing the logs submitted by Teledyne for its expert's time, the Court has no doubt these costs were reasonably incurred as a product of Shekar's misconduct. (*See* Expert Log [Dkt. # 259-4].) Shekar's only objection — that these are routine litigation costs that should be borne by the client — is both meritless and found in his sur-reply brief, which again waives his argument. He makes no objection to the other properly-documented costs sought by Teledyne. (*See* Pl.'s Br. [Dkt. # 259] at 13; Grumet-Morris Decl. [Dkt. # 259-1] ¶ 5; Costs Log [Dkt. # 259-3].) Accordingly, the Court finds that Teledyne may recover all of its $45,489.60 in costs.

**(D)** *Fees on Fees*

Lastly, Shekar challenges Teledyne's request for $36,643.95 in attorney's fees associated with preparing the instant motion and reply brief. The attorney and paralegal rates are the same as discussed above, so they are reasonable. The only issue is hours reasonably expended: 79.3 hours of attorney time and 6.3 hours of paralegal time. Approximately 85 hours is an alarmingly high number to spend on a fee petition. Although Shekar does not properly object to any of these hours, the Court is not satisfied that they were reasonably incurred.

Most notable is Ms. Grumet-Morris's time: she spent almost fifty partner hours on the initial motion, performing tasks such as reviewing and annotating invoices. (*See* Fees Log [Dkt. # 275-6].) She also logged multiple entries for the same tasks, such as three entries for "draft, review, and revise petition for and accounting of fees," totaling almost twenty hours. (*Id.*) This appears duplicative, and the brunt of these tasks could have been delegated to a paralegal or other administrative staff. Equally puzzling is the nine hours Ms. Grumet-Morris spent on "redrafting" Teledyne's reply brief, especially considering that (1) Mr. Ostrander spent 5.6 hours

14

drafting it originally, (*id.*), and (2) Shekar's response was eight pages and largely perfunctory. This is not to say that Teledyne's counsel did not undertake an arduous task in preparing the fee petition and responding to Shekar's arguments. But 85 hours of experienced attorney time is excessive. The Court will therefore reduce Teledyne's award by half ($18,321.98). *See ADT Sec. Servs. v. Lisle-Woodridge Fire Prot. Dist.*, 86 F. Supp. 3d 857, 871 (N.D. Ill. 2015) (reducing a fees-on-fees award by half where the prevailing party logged 200 attorney hours preparing a fee petition for a five-year case).

In sum, Shekar is liable for $ 303,150.60 for Teledyne's attorney's fees, $45,489.60 in costs, and $18,321.98 in fees related to the instant motion, totaling $366,956.18.[6]

### Shekar's Motion to Set Teledyne's Damages at Zero Dollars

Shekar's motion rests on familiar legal principles: waiver, estoppel, and laches. Beyond a general citation to these equitable doctrines, however, Shekar's motion falls short. The gist of his argument is that Teledyne slept on its rights and failed to prove its damages since having judgment entered in its favor. (Shekar Mot. [Dkt. # 280] at 1-2.)[7] But that is simply not the case.

---

[6] It is worth noting that Shekar should have seen this coming:

> [A]gain, I just advise you [Shekar's attorney] to explain to your client that none of this is going away, and the cash register . . . is cha-chinging away as we proceed. So every bit of effort [Shekar] makes [Teledyne and its counsel] go through, every time we come back here, they [Teledyne's counsel] have to be here. Every time they have to produce more and more documentation to prove what's already been proven, it's costing [them] money. And we are not going to waive that. [Shekar] may be paying for this for a very long time.

(9/2/15 Tr. at 8-15.)

[7] Shekar raises a litany of arguments in his reply brief, but they are, of course, waived for the purposes of his motion to set Teledyne's damages at zero. The Court will, however, consider the arguments raised in his reply brief as they pertain to Teledyne's proof of damages (discussed below).

The Court's contempt order was not an invitation for Teledyne to brief its damages, nor did that order trigger a timeline for such proof.[8] Indeed, Shekar has not cited any case suggesting that in circumstances such as this (where a defendant routinely defies the court, litigates in bad faith, and extends contempt proceedings for more than a year), that a five-month lapse of time in seeking damages is somehow inequitable. There is thus no sense in which Teledyne slept on its rights, unjustifiably delayed this case, or misled Shekar into thinking it would not seek damages, and his motion to set Teledyne's damages at zero is accordingly denied.

## Teledyne's Damages

The discussion could end here, but the fact remains that the damages issue is now squarely before the Court, and Teledyne has responded with detailed affidavits and other evidence of the harm caused by Shekar's misconduct, which it now asks the Court to consider in entering its final judgment. Shekar, moreover, has responded to Teledyne's damages claims at length, which leaves the Court satisfied that at least some of these issues are ripe for decision.

## I.      Legal Standard

Sanctions for contemptuous behavior include, as in this case, entry of default judgment against the contemnor. *Quela v. Payco-Gen. Am. Credits, Inc.,* No. 99 C 1904, 2000 U.S. Dist. LEXIS 6932, at *24 (N.D. Ill. May 17, 2000). Such a judgment establishes as a matter of law that defendants are liable to plaintiff on each cause of action alleged in the complaint. *United States v. Di Mucci*, 879 F.2d 1488, 1497 (7th Cir. 1989). Still, although the well-pleaded allegations in the complaint relating to liability are taken as true, those relating to damages are

---

[8] As Teledyne explains, "[g]iven the unusual procedural posture of this case . . . Teledyne understood that the issue of damages would be addressed after resolution of the contempt-related fees that Shekar forced Teledyne to incur." (Teledyne's Sur-Reply [Dkt. # 298] at 2.)

not. *Wehrs v. Wells*, 688 F.3d 886, 892 (7th Cir. 2012). Thus, the party seeking damages must prove its losses to the Court with a reasonable degree of certainty *Id.*

The only remaining question is whether a hearing is required. In this regard, the Seventh Circuit has cautioned that a final judgment of default "may not be entered without a hearing on damages unless 'the amount claimed is liquidated or capable of ascertainment from definitive figures contained in the documentary evidence or in detailed affidavits.'" *e360 Insight v. Spamhaus Project*, 500 F.3d 594, 602 (7th Cir. 2007) (citation omitted). But after reviewing the parties' briefs and related exhibits/evidence, the Court finds that Teledyne's stated damages are capable of being ascertained without a hearing (save one claim, discussed below).

## II.     Conversion of Teledyne's Projector

First, and perhaps least controversial, are the damages from Shekar's willful conversion of Teledyne's projector (an Epson PowerLite 1761W). Shekar bought and was reimbursed for the projector while he was a Teledyne employee, yet he never returned it after being fired, despite Teledyne's demands to do so. (*See* Compl. [Dkt. # 1] ¶¶ 116-121.)

Shekar's primary challenge in this regard is a flat-out denial of the above allegations. But this is unavailing for at least two reasons: (1) the factual allegations in the complaint pertaining to liability are no longer up for debate; and (2) even if they were, the written exchange between Shekar and Teledyne about the projector puts that debate to rest. (*See* 2/8/16 Winston & Strawn Letter [Dkt. # 1, Ex. H] at 1-2 (demanding that Shekar return the projector and other Teledyne property); 2/8/15 Shekar Email Response [Dkt. # 1, Ex. J] at 1-2 (acknowledging the projector and suggesting that Teledyne simply deduct its depreciated value from the severance pay it purportedly owed him); 2/8/15 Shekar Email Response [Dkt. # 1, Ex I] (suggesting that no

Teledyne property will be returned unless severance is paid)[9] Simply put, Shekar refused to return the projector after being fired, so he must pay for it.

To that end, the measure of damages for conversion is generally the fair market value of the property at the time and place of the conversion, plus legal interest. *Jordan v. Dominick's Finer Foods*, 115 F. Supp. 3d 950, 956-57 (N.D. Ill. 2015). It is the plaintiff's burden to show a reasonable basis to determine the value of items converted. *Id.* The evidence must "afford some reasonable and proper basis for ascertaining value," and at a minimum, "it must rise to the dignity of proof, and supply such elements or standards for measuring value to enable the trier of fact to exercise its judgment." *Id.* That said, Illinois courts do not restrict the manner in which fair market value should be computed, provided that damages are not predicated solely on mere speculation. *Id.*

Here, although the projector originally cost $849.00 when Shekar bought it,[10] Teledyne seeks to recover only the market value of a refurbished projector of the same make and model, which is $524.00. Teledyne supports this figure with the declaration of lead counsel Aviva Grumet-Morris and a copy of an eBay listing for a refurbished Epson PowerLite 1761W projector. (*See* Grumet-Morris Decl. [Dkt. # 288-5] ¶ 13; eBay Listing [Dkt. # 288-5, Ex. 3] at 1.) Further, as Teledyne explains, it is impossible to know for certain the fair market value of the original projector because Shekar never returned it, thereby preventing an inspection and reasonable assessment of its value.

---

[9] Shekar has not challenged, and the Court has no reason to doubt, the authenticity of these emails.

[10] Teledyne supports this price with the declaration of its Director of Program Management and Business Development and a receipt for the projector dated 12/11/2013, which includes the $849.00 price. (*See* Murray Decl. [Dkt. # 288-3] ¶¶ 2-4; Receipt [Dkt. # 228-3, Ex. I] at 1.)

Under these circumstances, the Court agrees. Although an eBay listing may not be the best indicator of fair market value, plaintiffs are given broad latitude in quantifying damages, "especially when the defendant's own conduct impedes quantification." *BCS Servs. v. Heartwood 88, LLC*, 637 F.3d 750, 759 (7th Cir. 2011). The refurbished price, moreover, fairly strikes a balance between (1) charging Shekar the full value of the printer, which would likely overcompensate Teledyne because of depreciation, and (2) some lower value, such as a used/non-refurbished printer, which would likely amount to an unfair penalty against Teledyne, given how much it actually paid for the projector out of the box.

For Shekar's part, he does not specifically challenge the $549.00 price, nor does he provide any evidence or argument about the market value of the projector. He simply maintains that he should be able to conduct discovery and depose Ms. Grumet-Morris about it. But this will not do because (1) Shekar has made it abundantly clear that he will abuse the discovery process if given the opportunity, and (2) it is unclear what value, if any, discovery and depositions would provide about the market value of the projector, since the facts supporting the projector's market price are not within Teledyne's custody or control, and they are otherwise readily available to Shekar (either in the form of the eBay listing Teledyne provided or through a routine internet search). To wit, Shekar could have argued that the eBay listing is a poor benchmark for market value, or perhaps he could have come forth with evidence of his own. But he didn't. Accordingly, the Court finds that Teledyne is entitled to $549.00 in compensatory damages for the conversion of its projector.

The Court declines, however, to grant Teledyne's additional request for punitive damages at a nine-to-one ratio. "Illinois courts do not favor punitive damages and insist that plaintiffs must establish . . . extraordinary or exceptional circumstances clearly showing malice or

willfulness." *Caterpillar Fin. Servs. Corp. v. Peoples Nat'l Bank, N.A.,* No. 10-298-GPM, 2012 U.S. Dist. LEXIS 89427, at *18 (S.D. Ill. June 28, 2012) (citing *Europlast, Ltd. v. Oak Switch Sys.*, 10 F.3d 1266, 1276 (7th Cir. 1993)). In this case, while Teledyne rightly notes that Shekar's misconduct has been extreme and exceptional, the facts surrounding his contemptuous behavior before the Court do not automatically render his conversion of Teledyne's property to be so exceptional that it warrants a nine-to-one punitive damages award. That said, the record plainly supports a finding that Shekar willfully converted the projector, so the Court will give Teledyne a two-to-one award, or $1,098.00 in punitive damages.

### III. Teledyne's Missing Files and the Computer Fraud and Abuse Act

Teledyne is entitled to compensatory damages under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, because after Shekar was fired, he logged onto Teledyne's servers (i.e., "protected computers")[11] without permission, transferred data to his own storage devices, and deleted or otherwise rendered inaccessible certain files on Teledyne's systems, causing damages. (*See* Compl. ¶¶ 41-50, 80-87); 18 U.S.C § 1030(a)(2), 5(C).[12]

Although the CFAA is generally criminal in nature, it also provides a private right of action for a person "who suffers damage or loss by reason of a [CFAA] violation." 18 U.S.C. § 1030(g). Thus, to recoup compensatory damages, a plaintiff must show *either* "damage" or "loss," as defined by CFAA. *Farmers Ins. Exch. v. Auto Club Grp.*, 823 F. Supp. 2d 847, 852

---

[11] "Protected computers" are defined, in part, as computers "used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B). Teledyne has adequately alleged that its servers are "protected computers" in this regard. (*See* Compl. ¶ 83.)

[12] Subsection (a)(2) prohibits intentionally accessing a protected computer without authorization or exceeding authorized access, thereby obtaining information from any protected computer. 18 U.S.C. § 1030(a)(2)(C). Subsection (a)(5)(C) prohibits intentionally accessing a protected computer without authorization, "and as a result of such conduct, caus[ing] damages and loss." 18 U.S.C. § 1030(a)(5)(C).

(N.D. Ill. 2011). "Damages" means "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). "Loss," in contrast, means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

Based on the facts alleged in the complaint, Teledyne suffered both loss and damages, but it seeks to recover only for $5,817.50 in forensic expert expenses, which it attests were related solely to the investigation and restoration of the data Shekar copied or deleted. (*See* Grumet-Morris Decl. [Dkt. # 288-5] ¶ 11; Roffman Decl. [Dkt. # 288-2] ¶¶ 2-4.) Those fees are plainly "losses" within the meaning of the CFAA.

Perhaps unsurprisingly, Shekar again objects to these fees on the basis that he needs to depose Teledyne's experts in this regard. Those depositions will reveal "in what context Mr. Roffman incurred these costs, including whether they arose out of Teledyne's prosecution of its CFAA claim or not, allow Mr. Roffman to be queried about the reasonableness of those costs; and allow Mr. Roffman to be queried about any and all other assertions that are set forth in his affidavit." (Shekar's Reply [Dkt. # 294] at 7.) Not so.

The Court has already belabored Shekar's persistent abuse of the litigation process. But more to the point, the facts Shekar claims he needs through discovery are already in front of him: Teledyne has submitted a declaration and fee log from its forensic experts explaining their rate, what efforts were made to diagnose the server problems, and how much time was spent on each task performed. (*See* Roffman Decl. [Dkt. #288-2, Ex. 1].) Shekar, however, has failed to articulate any basis for finding Teledyne's expert costs unreasonable in this regard, and he is

undoubtedly a tech-savvy defendant. Thus, the Court finds no need for a hearing or discovery on this issue, and Teledyne is accordingly entitled to recover $5,817.50 on its CFAA claim.

## IV.  Teledyne's Trade Secret's Claim

Teledyne next seeks compensatory and exemplary damages under the Illinois Trade Secrets Act ("ITSA"), which prohibits persons from, *inter alia*, misappropriating and disclosing another's trade secrets.[13] 765 Ill. Comp. Stat. §§ 1065/1-1065/9. As alleged in the complaint, Shekar willfully misappropriated Teledyne's highly-sensitive Pricing Worksheets, which contain Teledyne's confidential pricing formulates and the exact values the company attributes to various factors used to generate quotes in the electrical assembly industry. (Compl. ¶¶ 31-37, 60-63; *see also* 6/17/15 Mem. Op. & Order [Dkt. # 113] at 6.) These formulas and pricing values are both proprietary and critically important to Teledyne's competitive bidding practice. (Compl. ¶ 22-25, 32, 37.) Shekar misappropriated the worksheets for his own use and used them competitively to artificially inflate a purported Teledyne quote to a Teledyne customer, and then promising that he would "requote" them from a company he was soon joining as a part owner. (*Id.* ¶¶ 51-56.) Shekar therefore misappropriated Teledyne's trade secrets.

In terms of damages, the ITSA provides that "[i]f neither damages nor unjust enrichment caused by the misappropriation are proved by a preponderance of the evidence, the court may award damages . . . measured in terms of a reasonable royalty for a misappropriator's

---

[13] "Trade secret" means "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 Ill. Comp. Stat. § 1065/2.

unauthorized disclosure or use of a trade secret." 765 Ill. Comp. Stat. 1065/4(a). This is where Teledyne runs into trouble.

To ground its theory of damages (based on the misappropriation of the pricing work sheets), it relies on non-ITSA intellectual property cases from the Federal Circuit, which hold that a reasonable royalty is "simply that amount which the trier of fact estimates a person desiring to use [a trade secret] would be willing to pay for its use," and it is "often determined on the basis of a hypothetical negotiation." (Teledyne's Resp. [Dkt. # 288] at 9) (citing *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316 (Fed. Cir. 2011). Teledyne then goes on to state that while it would technically never license its confidential pricing sheets, it would do so hypothetically only if the royalty is higher than "the lower end of the range of profits it would make using its own Pricing Worksheets." (*Id.*) Thus, because it used those pricing worksheets to average more than $75,770,000.00 in sales from 2014-16, and "the well-known profit margin in [its] industry is 5-7%," it requests a royalty "[based on 5% of its total sales] for the period of Shekar's misappropriation on February 3, 2014 through the issuance of the February 27, 2015 TRO," or $145,711.54. (*Id.*)

There are several problems with this analysis. First, the hypothetical bargain Teledyne describes is unconvincing because it assumes the pricing worksheets actually *generated* its profits rather than simply serving as tools for competitive bidding. Second, the figures it relies upon for its total sales are, in part, based on *forecasts* from 2016, which is speculative. (*See* Baker Decl. [Dkt. # 288-4] ¶ 2.) And lastly, courts in this district analyzing reasonable royalties under the ITSA have required experts to determine the value of the claimed intellectual property. *See, e.g., Miller UK Ltd. v. Caterpillar, Inc.*, No. 10-cv-03770, 2015 U.S. Dist. LEXIS 147843, at *45 (N.D. Ill. Nov. 1, 2015); *Catapult Communs. Corp. v. Foster*, No. 06 CV 6112, 2010 U.S.

23

Dist. LEXIS 81673, at *6 (N.D. Ill. July 30, 2010). This Court will follow suit: if Teledyne wants a reasonable royalty for its worksheets, it must demonstrate their value with expert testimony, and Shekar must be permitted to respond. Whether the parties wish to do this through a hearing, through briefs, or not at all will be decided at the next status hearing. For similar reasons, the Court declines to reach the merits of Teledyne's "exemplary damages" claim under the ITSA, since that award would be based on the reasonable royalty award. *See* 765 Ill. Comp. Stat. § 1065/4(b) (granting courts the authority to award up to double damages if a defendant's misappropriation was willful and malicious).

## V.     Teledyne's Permanent Injunction

Next, Teledyne seeks a permanent injunction preventing Shekar from (1) using, disclosing, copying, storing, possessing, or transmitting any of Teledyne's confidential, proprietary, and/or trade secret information, including, but not limited to, quote files, pricing formulas, technical product specifications, price quotes, project bids, and any information sent to, relating to, or received from Teledyne customers or potential customers; (2) accessing or attempting to access Teledyne's information technology systems, including without limitation its server network; (3) acquiring or attempting to acquire Teledyne's confidential, proprietary, and/or trade secret information; (4) representing himself as a Teledyne employee or as being affiliated with Teledyne; and (5) communicating false information about Teledyne's quotes or its bidding and quotes process to any potential customer of Teledyne. (Teledyne's Resp. [Dkt. # 288] at 5.) Teledyne is entitled to this injunction.

The above items mirror the Court's prior entry of a preliminary injunction, which was based on unrebutted evidence submitted by Teledyne. (*See* 3/10/2015 Order [Dkt. # 62]). Moreover, given that Shekar has defaulted on the claims against him due to his contumacious

behavior, the facts alleged in the complaint are now presumed true. In other words, Teledyne has prevailed on its claims and shown that Shekar accessed Teledyne servers, stole or corrupted data, misrepresented Teledyne's sensitive information to potential customers, and, to this day, refuses to return Teledyne property or remedy his misconduct in any way. The Court is therefore satisfied that Teledyne will continue to suffer irreparable harm and that there is no adequate remedy at law to compensate it for Shekar's wrongdoing. The Court accordingly grants Teledyne's request for a permanent injunction. *See Am. Taxi Dispatch, Inc. v. Am. Metro Taxi & limo Co.*, 582 F. Supp. 2d 999, 1005 (N.D. Ill. 2008). Teledyne is ordered to submit a proposed injunction order to the Court within thirty days of the entry of this order.

## VI.    More Attorney's Fees

Both the Illinois Uniform Deceptive Trade Practices Act ("UDTPA"), 815 Ill. Comp. Stat §§ 510/1-510/7 and the ITSA provide that the prevailing party may recover reasonable attorney's fees if the defendant either willfully engaged in deceptive trade practices, 815 Ill. Comp. Stat. § 510/3, or willfully and maliciously misappropriated trade secrets, 765 Ill. Comp. Stat. § 1065/5. Teledyne has prevailed on both of these claims by virtue of Shekar's default, and the allegations in the complaint are sufficient to permit a finding of both willfulness and malice. (*See* Compl. ¶¶51-56, 98-101). Thus, Teledyne is yet again entitled to its reasonable attorney's fees in this regard. *See Am. Taxi Dispatch, Inc.*, 582 F. Supp. 2d at 1009 (granting attorney's fees on an UDTPA claim where the defendant had defaulted).

Like its prior award, Teledyne seeks recovery under the lodestar method for a total of $83,529.45. The rates charged are the same as those discussed earlier in the opinion, so they are reasonable ($441.00/hr for attorney time and $265.00/hr for paralegal time). In terms of hours, Teledyne's seeks to recover 45.8 hours of paralegal time and 157.1 hours of attorney time for the

period of February 5, 2015 through March 13, 2015 (when case was first filed through the entry of the preliminary injunction). None of these entries overlap with any of those detailed in Teledyne's motion for attorney's fees regarding Shekar's contempt. (*Compare* Contempt Fee Log [Dkt. # 260] *with* ITSA/UDTPA Fee Log [Dkt. # 228-5, Ex 1].) And Teledyne's counsel attests that these fees were incurred through litigating the ITSA and UDTPA claim. (*See* Grumet-Morris Decl. [Dkt. # 288-5].) Shekar, moreover, has failed to meaningfully object to any particular entry or otherwise show why a lower award should be given.[14]

That said, there are some entries that do not appear presumptively reasonable, particularly two block-billed entries:

- A 2/12/15 entry by Ms. Grumet-Morris, totaling sixteen hours, for attending multiple conferences with client, reviewing and revising the complaint based on new information, reviewing and revising the motion, proposed order, and memorandum of law in support of the TRO, conferring with Daniel Roffman, and corresponding with the client on various issues

- A 2/12/15 entry by Mr. Ofstrander, totaling sixteen hours, for drafting the motion for emergency TRO and memorandum of law in support, reviewing and revising motion for expedited discovery, reviewing and revising motion for protective order, reviewing and revising complaint for injunctive relief and related exhibits, reviewing and revising discovery requests, and calls related to filing and status

(ITSA/UDTPA Fee Log [Dkt. # 228-5, Ex 1] at 1-2.) While the Court has no doubt that both Mr. Ofstrander and Ms. Grumet-Morris are diligent workers, it is unable to ascertain how much time in their respective sixteen hour days was spent on each of the many tasks listed above. These

---

[14] Sheker simply recycles the same tired discovery arguments (i.e., that he must be entitled to depose Teledyne's counsel to determine the reasonableness of their fees). He also asserts, without argument, that Teledyne has not prevailed on its ITSA claim and that it only sought injunctive relief (rather than damages) for the UDTPA claim. Neither is availing. With respect to the ITSA, although the Court has not calculated a precise reasonably royalty for Shekar's misappropriation of Teledyne's work sheets, it remains clear that Teledyne suffered *some* damages in that regard. Similarly, concerning the UDTPA, Teledyne *did* request damages in its complaint and, in any event, a party's prayer for relief is irrelevant to the UDTPA's fee shifting provision.

entries are in stark contrast to the other block billing entries the Court allowed with respect to Shekar's contempt, which were for significantly less time and contained only a few tasks, thereby permitting at least some reasonable inference regarding how much time was spent on each task. *See Bretford Mfg. v. Smith Sys. Mfg. Co.*, 421 F. Supp. 2d 1117, 1119 (N.D. Ill. 2006) ("when the [attorney] time records do not describe tasks with particularity, and do not reveal the amount of time claimed to have been spent on a particular task, the judge is in no position to make a reasonable estimate of the amount of time that should have been required."). Accordingly, the Court will subtract 32 hours of attorney time, entitling Teledyne to a total of $67,196.70[15] in fees for its ITSA and UDTPA claims.

**VII.    Teledyne's Surety Bond**

Lastly, Teledyne requests the release of its surety bond for $10,000. "The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him." *Ty, Inc., v. Publ'ns Int'l, Ltd*, 292 F.3d 512, 516 (7th Cir. 2003). The need for a surety bond has expired in this case, so Teledyne's request is granted.

---

[15] This number is derived from 124.8 attorney hours at $441/hr. plus 45.8 paralegal hours at 265.50/hr.

## <u>CONCLUSION</u>

For the reasons set forth above, Teledyne's motion for attorney's fees [259] is granted in part. Teledyne is entitled to $366,956.18 for fees and costs pertaining to Shekar's contemptuous behavior. Shekar's motion to set Teledyne's damages at zero [280] is denied. Additionally, Teledyne is entitled to (1) $549.00 for the cost of its projector and an additional $1,098.00 in punitive damages for its conversion claim, (2) $5,817.50 in damages on its Computer Fraud and Abuse Act claim, (3) a permanent injunction as discussed in this opinion, (4) an additional $67,196.70 in attorney's fees based on its Illinois Trade Secrets Act claim and its Illinois Uniform Deceptive Trade Practices Act claim, and (5) the release of its $10,000 surety bond. The precise damages regarding Teledyne's trade secrets claim, however, cannot be determined on this record. A status hearing is set for 5/15/17 to determine how the parties wish to proceed with ascertaining those damages and to resolve any other damages issues before entry of final judgment. Teledyne is further ordered to submit a proposed permanent injunction order to the Court's inbox within thirty days.

**SO ORDERED.**                                         **ENTERED: April 27, 2017**


_Ronald A. Guzmán_
_____
**HON. RONALD A. GUZMÁN**
**United States District Judge**

28